State Court of Fulton County
**E-FILED**
25EV012749
2/19/2026 1:22 PM
Donald Talley, Clerk
Civil Division

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| DYNASTY SHIPPING, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | No. 25EV012749 |
| | ) | |
| NOLAN TRANSPORTATION GROUP, | ) | |
| LLC, *et al.* | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM OF
DEFENDANT NOLAN TRANSPORTATION GROUP, LLC**

Defendant Nolan Transportation Group, LLC ("Nolan"), for its Answer, Affirmative Defenses, and Counterclaim to the Complaint for Damages (the "Complaint") of Plaintiff Dynasty Shipping, LLC ("Dynasty"), states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.  Nolan is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of the Complaint and therefore denies the same.

2.  Nolan admits the allegations contained in Paragraph 2 of the Complaint.

3.    Nolan is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 of the Complaint and therefore denies the same.

4.    Nolan is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 of the Complaint and therefore denies the same.

5.    In response to the allegations contained in Paragraph 5 of the Complaint, Nolan admits that venue is proper in this Court pursuant to the Credit Application and incorporated Customer Terms and Conditions (the "Terms and Conditions") attached to the Counterclaim as Exhibit A.  The remaining allegations contained in Paragraph 5 of the Complaint constitute legal conclusions to which no response is required.   To the extent a response is required, Nolan denies the remaining allegations contained in Paragraph 5 of the Complaint.

## FACTUAL BACKGROUND

6.    In response to the allegations contained in Paragraph 6 of the Complaint, Nolan admits that Dynasty hired Nolan, but denies that Dynasty hired Nolan to "perform" transportation.  Nolan is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 6 of the Complaint and therefore denies the same.

7.    Nolan denies the allegations contained in Paragraph 7 of the Complaint.

## COUNT I
## CARMACK CLAIM

8.    Nolan incorporates by reference its responses above as if fully restated here.

9.    In response to the allegations contained in Paragraph 9 of the Complaint, Nolan admits that Dynasty tendered certain goods to Nolan and requested that Nolan arrange for the transportation of such goods by a motor carrier, but denies that such goods were tendered for "transport" by Nolan.

10.    In response to the allegations contained in Paragraph 10 of the Complaint, Nolan denies that it was a "connecting carrier" and denies that it issued a bill of lading.  Nolan is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 10 of the Complaint and therefore denies the same.

11.    In response to the allegations contained in Paragraph 11 of the Complaint, Nolan admits that the Shipment was never delivered to its destination, but denies that Nolan was the entity that would have delivered the Shipment.

12.    In response to the allegations contained in Paragraph 12 of the Complaint, Nolan admits that it has not paid Dynasty's claim.  Nolan is without sufficient knowledge or information to form a belief as to the truth of the remaining

3

allegations contained in Paragraph 12 of the Complaint and therefore denies the same.

13.     Nolan denies the allegations contained in Paragraph 13 of the Complaint.

14.     Nolan denies the allegations contained in Paragraph 14 of the Complaint.

## <u>COUNT II</u>
## <u>ALTER EGO LIABILITY</u>

15.     Nolan incorporates by reference its responses above as if fully restated here.

16.     Nolan admits the allegation contained in Paragraph 16 of the Complaint.

17.     Nolan is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint and therefore denies the same.

18.     Nolan is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint and therefore denies the same.

19.    Nolan is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint and therefore denies the same.

20.    Nolan is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint and therefore denies the same.

21.    Nolan is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Complaint and therefore denies the same.

22.    Nolan denies that Dynasty is entitled to any of the relief requested in the Complaint's Prayer of Relief, including sub-parts (a)-(e).

23.    Nolan denies each and every allegation contained in the Complaint that is not expressly admitted herein.

## AFFIRMATIVE DEFENSES

Nolan asserts the following separate and affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

1.    Dynasty's Complaint fails to state claims, in whole or in part, upon which relief may be granted, among other reasons, because Nolan is not a "carrier" as that term is defined in 49 U.S.C. § 13102(3).

### SECOND AFFIRMATIVE DEFENSE

2.      Dynasty's claims are barred, in whole or in part, by the applicable statute of limitations, the doctrine of laches, and any other applicable time bar.

### THIRD AFFIRMATIVE DEFENSE

3.      Dynasty's claims are preempted by the Federal Aviation Administration Authorization Act, 49 U.S.C. § 14501(c).

### FOURTH AFFIRMATIVE DEFENSE

4.      Dynasty's claims are barred by the Terms and Conditions attached to the Counterclaim as Exhibit A, which provide that Nolan is a "Broker" that arranges for "the transportation of Goods by an authorized motor carrier[.]"

### FIFTH AFFIRMATIVE DEFENSE

5.      Dynasty's claims are barred by the doctrines of set off and recoupment.

### SIXTH AFFIRMATIVE DEFENSE

6.      Nolan's relies on the defenses of release and waiver, if proven by applicable investigation and discovery.

### SEVENTH AFFIRMATIVE DEFENSE

7.      Dynasty's claims are barred, in whole or in part, because Dynasty has failed to mitigate its claimed damages, if any.

### EIGHTH AFFIRMATIVE DEFENSE

8.    Dynasty's claims are barred by its own breaches of the Terms and Conditions.

## NINTH AFFIRMATIVE DEFENSE

9.    Nolan expressly reserves its right to amend this Answer to add further affirmative defenses and claims upon discovery of additional facts and for other good cause.

## PRAYER FOR RELIEF

**WHEREFORE**, having fully answered the Complaint, Nolan prays that this Court enter judgment in favor of Nolan as follows:

a. A judgment dismissing Dynasty's Complaint in its entirety with prejudice and awarding Nolan its costs and fees, including reasonable attorneys' fees;

b. All other relief to which Nolan may be entitled at law or in equity.

## COUNTERCLAIM

Nolan, for its Counterclaim against Dynasty, alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Nolan is a Delaware limited liability company with its principal place of business located in Atlanta, Georgia.

2.    Upon information and belief, Dynasty is a California limited liability company with its principal place of business located in Cerritos, California.

3.     This Court has personal jurisdiction over Dynasty because Dynasty has consented to this Court's personal jurisdiction by filing the Complaint.

4.     Venue is proper in this Court as Dynasty has commenced litigation in this Court and pursuant to the Terms and Conditions attached hereto as Exhibit A, which provide "[Dynasty] submits to the jurisdiction and venue of the state courts located in Fulton County, Georgia . . . with respect to any and all matters arising from this agreement." (Terms and Conditions, § XIII.)

## FACTUAL BACKGROUND

5.     Nolan is a leading, federally-licensed freight broker. Nolan is in the business of arranging for the transportation of its customers' freight by motor carrier. Nolan is not a motor carrier and does not perform the actual transportation of its customers' freight.

6.     Upon information and belief, Dynasty is a provider of third-party logistics services, managing shipments for its customers.

7.     On or about July 17, 2020, Dynasty submitted a Credit Application to Nolan, which incorporated the Terms and Conditions, in order to use Nolan's services on a credit basis. The Credit Application and the Terms and Conditions are attached hereto as **Exhibit A**.

8.     The Credit Application's "Contract Provisions" provide that Nolan is "non-asset based Broker and will be referenced as a Broker when any determination of relationship is needed between [Nolan] and [Dynasty]."

9.     From on or about July 2020 through September 2025, at Dynasty's request, Nolan provided freight brokerage services to Dynasty, arranging for the transportation of Dynasty's freight, subject to the Terms and Conditions.

10.     Under the business relationship between Nolan and Dynasty, Nolan, among other things, identified and communicated with available motor carriers, contracted with such motor carriers to transport Dynasty's freight, and paid such motor carriers (collectively, the "Services").

11.     In exchange for the Services, Dynasty was obligated to pay Nolan an agreed upon rate for each shipment of Dynasty's goods.

12.     Nolan issued an invoice to Dynasty for each shipment Nolan brokered on Dynasty's behalf reflecting the agreed upon rate.

13.     Under the terms and conditions, Dynasty was required to pay all invoices within thirty (30) days of the invoice date.  (*See* Terms and Conditions, § III.B.)

14.     Nolan provided the Services to Dynasty at Dynasty's request, but Dynasty has failed to pay for the Services, despite demand.

15.     As of the date of the filing of this Complaint, Dynasty owes Nolan One Hundred Thirty-Nine Thousand One Hundred Forty Dollars ($139,140.00).

## CLAIMS FOR RELIEF

## COUNT I
### (Breach of Contract)

16.     Nolan incorporates by reference the allegations set forth above in Paragraphs 1-15.

17.     The Credit Application and its incorporated Terms and Conditions constitute a valid and binding contract.

18.     Nolan has fulfilled its obligations to Dynasty by performing the Services.

19.     Dynasty has failed to comply with the Terms and Conditions by failing to remit payment to Nolan for the Services.

20.     All conditions precedent to Nolan's recovery have been satisfied.

21.     Nolan has been damaged by Dynasty's breach in the amount of One Hundred Thirty-Nine Thousand One Hundred Forty Dollars ($139,140.00).

22.     Accordingly, Nolan is entitled to recover from Dynasty the sum of One Hundred Thirty-Nine Thousand One Hundred Forty Dollars ($139,140.00), plus pre-judgment interest, costs, and reasonable attorneys' fees pursuant to Section III.B(5) of the Terms and Conditions.

## COUNT I
### (Quantum Meruit)

23.    Nolan incorporates by reference the allegations set forth above in Paragraphs 1-15.

24.    Nolan conferred a benefit on Dynasty by performing the Services on Dynasty's behalf and at Dynasty's request.

25.    Dynasty knew of the benefit Nolan was conferring on it by Nolan's provision of the services and accepted that benefit.

26.    Dynasty further knew and understood that Nolan expected to be paid for the Services.

27.    The reasonable value of the Services is One Hundred Thirty-Nine Thousand One Hundred Forty Dollars ($139,140.00).

28.    It would be unjust to allow Dynasty to retain the benefit of the Services without paying for the same.

29.    Accordingly, Nolan is entitled to recover from Dynasty the sum of One Hundred Thirty-Nine Thousand One Hundred Forty Dollars ($139,140.00), plus pre-judgment interest and costs.

**WHEREFORE,** Nolan demands:

1.    Judgment in its favor on each of its claims for relief;

2.    Judgment in favor of Nolan and against Dynasty on Count I in the amount of One Hundred Thirty-Nine Thousand One Hundred Forty Dollars ($139,140.00), plus pre-judgment interest, costs, and reasonable attorneys' fees pursuant to Section III.B(5) of the Terms and Conditions;

3.    Judgment in favor of Nolan and against Dynasty on Count II in the amount of One Hundred Thirty-Nine Thousand One Hundred Forty Dollars ($139,140.00), plus pre-judgment interest and costs; and

4.    All other relief in law or equity to which Nolan may be entitled.

**STONE KALFUS LLP**

*/s/ Aleksandra Mitchell*
Matthew P. Stone
Georgia Bar No. 684513
Shawn N. Kalfus
Georgia Bar No. 406227
Aleksandra Mitchell
Georgia Bar No. 136019
One Midtown Plaza
1360 Peachtree St. NE, Suite 1250
Atlanta, GA 30309
Matt.Stone@StoneKalfus.com
Alex.mitchell@stonefalfus.com

Marc S. Blubaugh (Oh Bar No. 0068221) (*pro hac vice* forthcoming)
**BENESCH,        FRIEDLANDER, COPLAN & ARONOFF LLP**
41 S. High Street, Suite 2600
Columbus, Ohio 43215
Telephone:  (614) 223-9300

Facsimile:  (614) 223-9330
Email: mblubaugh@beneschlaw.com

Nicholas P. Lacey (OH Bar No. 0100042) (*pro hac vice* forthcoming)
**BENESCH,        FRIEDLANDER, COPLAN & ARONOFF LLP**
41 S. High Street, Suite 2600
Columbus, Ohio 43215
Telephone:  (614) 223-9300
Facsimile:  (614) 223-9330
Email: nlacey@beneschlaw.com

*Counsel   for   Defendant Nolan       Transportation Group, LLC*

# EXHIBIT A

# Contract Provisions

**PERTAINING TO ALL SERVICES.** Nolan Transportation Group, LLC ("NTG") is a non-asset based Broker and will be referenced as a Broker when any determination of relationship is needed between NTG and Customer. I hereby apply to Nolan Transportation Group, LLC ("NTG") for credit and this form is my authorization to contact our credit references and banking institutions now, and at any future date, for full disclosure of current credit status and release of credit history. This form is not an agreement to extend credit, and that NTG, at its discretion, may extend or withdraw credit at any time. I will promptly notify NTG of any subsequent changes which would affect the accuracy of any information provided. I agree to pay all invoices within 30 days of the invoice date. Further, I agree to pay a service charge of 1 ½% per month on any and all past due balances. I shall be responsible for 15% attorney fees on the principal and accrued interest combined in the collection of the undersigned's account. By signing this form, I hereby submit to the jurisdiction and venue of the state courts located in Fulton County, Georgia, or a venue to be decided at the sole discretion of Nolan Transportation Group, with respect to any and all matters arising from this agreement. I do herby waive all objections to venue and jurisdiction, including forum non conveniens. By doing business with NTG you are subject to NTG's continued terms and conditions located at www.ntgfreight.com/services.

**INSURANCE.** Unless NTG has been notified in writing prior to the shipment, all loads valued over $100,000.00 will not be covered over the minimum $100,000.00 cargo insurance NTG requires Carriers to have in coverage. While truckload freight is covered up to $100,000.00 in liability insurance, LTL freight liability insurance can range anywhere from ten cents ($0.10) to twenty dollars ($20.00) per pound, depending on the Carrier's liability provisions and/or the class of the commodity. Additional cargo insurance can be arranged by written request from the Customer and approved by NTG.

**LESS THAN TRUCK LOAD (LTL).** LTL rates provided by NTG are based on: origin and destination zip codes, distance, commodity freight class (per the National Motor Freight Classification and/or the shipments density, depending on the particular carrier's pricing terms) and gross shipping weight including all packaging materials, crating and/or pallets as a cost-per-pound and volume of space required for transit. The Customer is required to use the Bill of Lading (BOL) supplied and issued by NTG. Failure to do so may result in delivery delays of freight and extra charges due to loss of discounts and reprocessing fees.

**QUOTED RATE.** All shipments are rated, quoted, and booked based on the exact information provided by the customer. Rate quotes are recommendations that include the following factors in calculation: (1) the gross weight of the shipment including all packaging materials and pallets. (2) The exact commodity being shipped, described by its freight class and/or NMFC code. (3) The dimensions per shipping unit and volume of space needed. (4) The number of shipping units. (5) Assessorial Services: these services are provided by the Carrier in addition to the basic transportation service of the freight. Shipments are quoted from dock to dock; therefore, any assessorial services will result in additional charges. These include, but are not limited to: lift gate service, "limited access" pickups/deliveries, including residential, inside pickups/deliveries, appointments and/or notification service, temperature control, location updates, and other services outside of the standard shipping of freight.

**ADJUSTMENTS.** The Carrier reserves the right to verify a shipment's weight, dimensions, freight class, and any assessorial services provided; accessorial services include but are not limited to detention, lift gate service, residential/limited access service, appointments, and lumper service. In the event a Carrier discovers these items are incorrectly described on the BOL a freight inspector will document the differences and a "Billing Adjustment" will be issued. Should this occur the Customer agrees to pay for all adjustments (if any) and adjustments will be automatically charged to the Customer's open account with NTG. Billing adjustments may also incur a rebilling and reprocessing fee.

**DRAYAGE.** Quotations as to fees, rates of duty, freight charges, insurance premiums or other charges given by NTG to Customer are for informational purposes only and are subject to change without notice. Customer will be renting space in container subject to charges for time period container is used. All charges must be paid by Customer in advance unless NTG agrees in writing to extend credit to Customer. NTG will invoice for Per Diem, Detention, and Demurrage charges upon receipt from steamship line or airline. Per Diem, Detention, and/or Demurrage invoices may be submitted separately to Customer and are due upon receipt of invoice by Customer. Penalty charges may apply where invoices are not paid within seven (7) days of receipt. NTG reserves up to six (6) months after shipment is completed to invoice for per diem, detention, and/or demurrage. Processing fees from carriers may apply. Customer is responsible for payment on invoices for any additional charges incurred from Freight Forwarder, steamship, and/or airline.

**INITIAL BILLING.** The estimated/initial cost for each shipment is billed and charged to the Customer's open account at the time of dispatch. The Customer understands that this initial billing is based on the information provided by the customer and that this billing is done in "good faith" by NTG with the assumption that the Customer provided true and accurate information reflecting the actual description of their shipment and services to be provided.

**DISPUTES.** If rates are adjusted by the Carrier NTG has ten (10) business days to dispute and appeal the adjustments. NTG then has the opportunity to provide proof to reverse these adjustments. I promise to provide written notice to NTG in ten (10) business days of any and all disputes regarding any bill.

**CANCELLATION OF SERVICES.** The Customer may cancel a freight shipment at any time up to twenty-four (24) hours from scheduled pickup or else a fee of up to ten (10%) percent of the predetermined line haul amount may be charged to compensate the Carrier.

**ELECTRONIC SIGNATURE (ESIGNATURE).** Customer consents and agrees that their use of a key pad, mouse or other device to select an item, button, icon or similar act/action while using any electronic service NTG offers; or in accessing or making any transactions regarding any document, agreement, acknowledgement, consent, term, disclosure, or condition constitutes Customer's signature, acceptance and agreement as if actually signed by Customer in writing. Further, Customer agrees that no certification authority or other third party verification is necessary to validate Customer's electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of Customer's signature or resulting contract between Customer and NTG. Customer understands and agrees that the eSignature executed in conjunction with the electronic submission of the application will be legally binding and such transaction will be considered authorized by Customer.

**BATCH INVOICING.** Batch invoicing is a service available to qualifying customers. Invoices will be consolidated and sent to Customer at the specific batch interval that is selected. Payment terms for batch invoicing are determined based on the batch interval. Weekly Invoicing requires NET 21 payment terms; Bi-Weekly Invoicing requires NET 15 payment terms; Monthly Invoicing requires payment due immediately upon receipt of the batch invoices. NTG, at its discretion, reserves the right to cancel Batch Invoicing at any time, without notice to the Customer. Customer understands that failure to pay within the Batch Invoice terms may result in NTG revoking the Customer's use of this service in the future, and is subject to all of NTG's extended terms and conditions.

**NOTICE.** The contract provisions located at www.ntgfreight.com/services are incorporated by reference and constitute a part of this agreement. Reference should be made to the extended terms of this agreement as stated above and located at www.ntgfreight.com/services for information regarding all of NTG's terms and conditions. Any business conducted between NTG and Customer will be done with the presumption Customer has thoroughly reviewed all NTG terms and conditions.

**Remittance Address:** Nolan Transportation Group, LLC | P.O. Box 931184 | Atlanta, GA 31193-1184
**Overnight Address:** Attn: Lockbox 931184 | 3585 Atlanta Avenue | Atlanta, GA 30354-1705

2020 EDITION
1 of 2

# Customer Profile Form

Email this completed form to creditapp@ntgfreight.com

## Company Information *required

NAME OF BUSINESS: Dimasta Shipping LLC

DBA: 12750 Moore St

PHYSICAL ADDRESS: Cerritos

CITY: Cerritos   STATE: CA   ZIP CODE: 90703

WEBSITE URL:

# OF LOCATIONS:

## Business Descriptions *required

FEDERAL TAX ID: 47-2643465   DUNS NUMBER:

PRESIDENT / OWNER NAME: Yantao Zhang

BUSINESS TYPE: Logistics Company   DATE BUSINESS STARTED: 2015

FF / MC / DOT # (If Applicable): $25K

REQUESTED CREDIT LIMIT: $25K   MONTHLY PROJECTED VOLUME: 10 to 20 loads

## Accounts Payable Contact *required

AP CONTACT NAME: Johnson Zhang

AP EMAIL ADDRESS: op@dimshipping LLC.com

ALTERNATIVE INVOICING EMAIL ADDRESS:

AP PHONE: 562-474-8289   EXT.   AP FAX:

## Traffic Manager Contact *required

TRAFFIC MANAGER NAME: Johnson Zhang

EMAIL ADDRESS: op@dimshippingLLC.com

TRAFFIC PHONE: 562 474 8289   TRAFFIC FAX:

> THIRD PARTY PAYMENT PROCESSORS: IN THE EVENT YOU USE THIRD PARTY PAYMENT SERVICES, YOU ARE PLACING YOUR COMPANY'S CREDIT REPUTATION IN THE HANDS OF OTHER PARTIES AND ULTIMATELY REMAIN RESPONSIBLE FOR TIMELY PAYMENT OF INVOICES REGARDLESS OF ANY AGREEMENTS YOU MAKE WITH THE THIRD PARTY. PAYMENT MUST BE MADE IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF NTG. NON-PAYMENT OF INVOICES MAY BE CAUSE FOR SUSPENSION OF CREDIT AND OTHER PENALTIES. PLEASE INCLUDE ALL BILLING INFORMATION YOUR COMPANY IS USING A THIRD PARTY PAYMENT SERVICE.

## Billing Information *required

BILLING ADDRESS: 12750 Moore St

CITY: Cerritos   STATE: CA   ZIP CODE: 90703

## NET Terms *required
Please check one of the below options
- [ ] NET 10
- [ ] NET 15
- [x] NET 21
- [ ] NET 30 (DEFAULT)
- [ ] OTHER

## Invoice Method *required
Please check one of the below options
- [x] EMAIL (DEFAULT)
- [ ] POSTAL
- [ ] FAX

## Payment Method *required
Please check one of the below options
- [x] CHECK
- [ ] ACH
- [x] WIRE
- [ ] CREDIT CARD

## Check Run Frequency
If paying by check, please select frequency
- [ ] ONCE A WEEK
- [x] TWICE A WEEK
- [ ] TWICE MONTHLY
- [ ] MONTHLY

What paperwork do you require for payment processing? (Ex: POD, Invoice, BOL, etc.) POD/INV

If you chose to attach **credit and trade references** separately, please email the document(s) to creditapp@ntgfreight.com.
Though not required, providing references will speed up the approval process and potentially allow a higher credit limit in the future.

### Credit References (Carriers / Brokers)

| | COMPANY NAME | CONTACT NAME | CONTACT PHONE | EMAIL ADDRESS |
|---|---|---|---|---|
| 1. | PYC Custom Broker | Lan / Lily | 310 644 4205 | service@cc-chb.com |
| 2. | Lisa Ragan | Lisa Ragan | 770-996 9903 | lisa@lisaragan.net |
| 3. | | | | |

### Trade References (Customers / Suppliers)

| | COMPANY NAME | CONTACT NAME | CONTACT PHONE | EMAIL ADDRESS |
|---|---|---|---|---|
| 1. | Landstar | Alex Shapiro | 408 232 4800 | Landstarucno landstarmail.com |
| 2. | ABAJAN Express | Mana | 323 878 4692 | dispatch@abajanexpress.com |
| 3. | | | | |

Name (PRINT): Yantao Zhang

Authorized Signature X

THIS DOCUMENT MUST BE SIGNED AND DATED

Title: Owner

Date: 07/17/20

NTG

The contract provisions on page one (1) are incorporated by reference and constitute a part of the agreement.
Reference should be made to the terms of this agreement as stated on page one (1) and NTG's extended terms and conditions located at www.ntgfreight.com/services.

**Remittance Address:** Nolan Transportation Group, LLC | P.O. Box 931184 | Atlanta, GA 31193-1184
**Overnight Address:** Attn: Lockbox 931184 | 3585 Atlanta Avenue | Atlanta, GA 30354-1705

2020 EDITION
2 of 2



# Customer Terms and Conditions

**Please read these Terms and Conditions carefully before using this site. By accessing this site, you agree to be bound by the Terms and Conditions below.** Nolan Transportation Group, LLC f/k/a Nolan Transportation Group, Inc. ("NTG"), maintains this site (the "Site") to provide you with information about the transportation products and services and permits you to engage in transactions for your account with NTG. NTG requires that all those accessing the Site agree to and comply with the following terms and conditions. Please read these Terms and Conditions carefully. By accessing the Site in any capacity, you indicate your acknowledgment and acceptance of the Terms and Conditions. No provision of this Agreement shall be amended, waived or modified except by an instrument in writing signed by both parties.

These Customer Terms and Conditions (these "Terms") as well as the terms and conditions of any NTG-provided rate quote/confirmation, if any, apply to the provision or arrangement, as applicable, of any transportation services ("Services") by NTG. These Terms set forth the rights and obligations of NTG and Customer (defined below) except as otherwise set forth herein. By tendering goods to NTG for Services, Customer expressly accepts these Terms and warrants that acceptance of these Terms has been authorized by a representative of Customer as of the date the Services were first provided to Customer by NTG. NTG may change these Terms at any time without notice to Customer. The changed Terms are in effect immediately.

## I. DEFINING PARTIES

**A.** Nolan Transportation Group, LLC f/k/a Nolan Transportation Group, Inc. further known as "NTG". 1) The terms and conditions as further stated dominates and supersedes any and all other contracts between Customer and NTG. 2) NTG is a Broker and will be referenced as a Broker when any determination of relationship is needed between NTG and Customer. 3) NTG is non-asset based and will provide consultation on transportation, freight quoting, financial settlement, auditing, tracking, Customer service, and issue resolution.

**B. Customer:** "Customer" means the person or entity at whose request, for whose benefit, or on whose behalf NTG provides any Services, including any third party logistics provider, shipper, consignor, consignee, beneficial cargo owner, or any other party or its agent acting on behalf of such person or entity with interest in the shipment.

## II. DEFINITIONS

**A. Broker:** "Broker" means a person or entity that, for compensation, arranges, or offers to arrange, the transportation of Goods by an authorized motor carrier or rail transportation provider. "Broker" shall be used interchangeably with "NTG" throughout these Terms herein.

**B. Carrier:** "Carrier" means any motor carrier, including its drivers and independent owner operators, any rail carrier or rail transportation service provider, any intermodal equipment provider, any ocean or air carrier (including non-vessel operating common carriers and indirect air carriers), any warehouse operator, or other person or entity that provides transportation, storage, handling or related services to the Goods at the request of NTG.

    **1)** Customer understands that NTG is not a carrier, but that NTG will use its best efforts to select and engage responsible carriers, warehousemen, and other transportation intermediaries on behalf of Customer.

**C. Claims:** "Claims" mean any and all liabilities, claims, losses, suits, actions, costs, fines, penalties, expenses (including attorney's, paralegal's and expert witness' fees, and other costs of defense, investigation and settlement), judgments, or demands on account or damage of any kind whatsoever, including but not limited to personal injury, property damage, cargo damage, environmental damage, or any combination thereof, suffered or claimed to have been suffered by any person or entity as well as the costs of enforcing indemnification obligations and costs of containment, cleanup and remediation of spills, releases or other environmental contamination.

## III. BILLING

**A. Rates.** 1) Rates are based on the Terms herein. Finance charges may apply and will come due at the time of assessment. 2) Customer will be responsible for any additional charges assessed by NTG due to deviation from the agreed terms including, but not limited to, weight, pallet count, product commodity, appointment date and times, consignment, and other accessorial charges. 3) In the event that NTG accepts and provides Services to Customer before reaching an agreement with Customer on pricing, Customer agrees to pay NTG the last pricing quoted by NTG to Customer for that load or, in the event that no pricing has been provided by NTG, Customer agrees to pay for NTG's Services based on NTG's current market rates. 4) All rates and quotes are subject to change at any current time based upon NTG's transportation cost, fuel, and other applicable accessorial charges. 5) Customer shall be liable for all charges payable on account of such Customer's shipment. 6) NTG invoices will be accepted via email with invoice and POD in exchange for payment. 7) Any special requirements pertaining to shipment must be addressed by Customer in writing to NTG prior to shipment. 8) NTG must be notified at the time of receipt of invoice of any discrepancies that may result in short pays. 9) NTG reserves the right to bill any other party that has an invested interest in the freight if the bills remain unpaid. 10) Customer is responsible for all costs, including without limitation, forklift service, tow truck service, storage or recover/release fee, or crane service in regards to the freight Customer has requested NTG arrange for transport. 11) Customer is responsible for all border crossing documentation and must submit to NTG or agent prior to crossing. NTG is not responsible for any delays related to border or customs agents, etc. Delays relating to such will result in accessorial charges. 12) Unless arranged or agreed upon, in writing, prior to shipment, NTG is not bound to arrange transport of a shipment by a particular schedule or in time for a particular market. However, Carrier is responsible to transport with reasonable dispatch. 13) Lumper Receipts: All lumpers require reimbursement with a provided receipt. Any dispute must be submitted within five (5) business days. 14)

Detention: The first two (2) hours at the shipper or receiver are free. Any additional hours will require a detention payment of $50.00/hour. **15)** NTG reserves the right to amend or adjust charges and re-invoice the Customer as a result of, but not limited to, the follow circumstances:

    **1)**   If the original quoted amount was based upon the incorrect information provided by the Customer, or

    **2)**   If additional services by the Carrier were required, or

    **3)**   If the Customer authorized Carrier to perform the pickup, transportation and delivery functions other than contemplated by the BOL.

**B. Payment. 1)** Payment terms and credit limits are subject to credit approval, which shall be determined in the sole discretion of NTG. **2)** All payments must specify an exact U.S. Dollar amount to be legally sufficient. **3)** All invoices shall be paid to NTG within thirty (30) days of the invoice date and Customer further agrees to pay a service charge of 1½% per month on all overdue balances. **4)** Customer is responsible for any court costs or attorney fees incurred by NTG in the collection of invoices billed to Customer. **5)** Customer guarantees payment for all services rendered and carriage arranged by NTG on Customer's behalf. **6)** Customer and consignee, holder, or assignee on any bill of lading shall be jointly and severally liable for all unpaid fees for services provided under this Agreement. When NTG is instructed to collect charges from any person or entity other than Customer, Customer shall remain liable for the charges and interest if NTG is not paid.

# IV.  INSURANCE COVERAGE

**A.**  Unless NTG has been notified in writing prior to the shipment, all loads valued over $100,000.00 will not be covered over the minimum $100,000.00 cargo insurance NTG requires Carriers to have in coverage. Customer may consult an insurance broker to arrange insurance appropriate to Customer's needs. As an alternative, where NTG agrees to do so, NTG may offer, for an additional cost and through its designated insurance broker, to arrange for shipment-specific cargo policies to be issued in Customer's name. Following the issuance of any such policy through their insurance underwriter, NTG will have no further duty regarding cargo insurance and no liability for loss of, delay of, or damage to the Goods during transport or storage, whether covered by insurance on the Goods or not, and whether such loss, delay or damage has been caused or contributed to by its negligence or breach of these Terms, or otherwise. Any coverage on the Goods will be subject to the terms and conditions of the specific policy or policies procured. NTG is not liable if Customer, for any reason whatsoever, fails to recover a loss in whole or in part from the insurer under any applicable policy, even though the premium charged by the insurer may be different from NTG's charge to the Customer. Customer acknowledges and agrees that NTG's role is limited to facilitating placement of coverage with entities licensed to sell insurance and that NTG is not in the business of selling insurance or insuring risk.

**B.**  Customer is responsible for maintaining property insurance covering the Goods, both for the Goods and in transit, including loading and unloading.

**C.  NTG requires all Carriers to have:**

    **1)**  Commercial General Liability Insurance written on an occurrence basis in amounts not less than: (1) Bodily Injury: $1,000,000.00 per person; $1,000,000.00 annual aggregate (2) Property Damage: $1,000,000.00 per occurrence; $1,000,000.00 annual aggregate.

    **2)**  Automotive or Fleet Liability Insurance in amounts not less than: (1) Bodily Injury: $1,000,000.00 per person; $1,000,000.00 per occurrence (2) Property Damage: $1,000,000.00 per occurrence

    **3)**  Worker's Compensation Insurance and Employer's Liability Insurance subject to a limit of not less than $500,000.00.

    **4)**  Motor Truck Cargo Insurance in an amount not less than $100,000.00 per truckload in order to compensate shipper, consignee or the beneficial owner of the shipment for any loss or damage thereto.

**D. NTG Contingent Insurance.**   All NTG insurance policies are contingent based on NTG's contracted Carrier's insurance. These Contingent policies cover Goods in transit within the Continental United States and Canada. NTG does not provide any insurance coverage for shipments within the country of Mexico. Neither NTG nor any Carrier will have any liability for loss, damage or delay of Goods or shipments occurring in Mexico. This coverage is subject to the terms and conditions contained therein. Coverage is from door to door during the ordinary course of transit.

    **1)**  Additional insurance for each shipment can be purchased at an additional cost if requested in writing by Customer prior to tendering the shipment to NTG.

# V.  CLAIMS FOR DAMAGE OR LOSS

**A. Cargo Claims.** Customer understands NTG's Claim Department only facilitates Cargo Claims for loads that have shipped via NTG's contracted Carrier. NTG is not responsible for Liability Claims. All Liability Claims will need to be handled with NTG's contracted Carrier or Carrier's insurance directly.

**B.** In order for NTG to facilitate the filing of a Customer Cargo Claim, Customer must adhere to the following:

    **1)** NTG must be advised and notified within five (5) working days of delivery of the property, except for claims for failure to make delivery must be filed within five (5) days after the scheduled delivery date.

**(a)** Customer agrees that NTG will not be held responsible for any loss or damage if written notice of damage is not provided to NTG within five (5) days of delivery.

**2)** Once notification of claim is received, all paperwork for claim must be submitted to NTG within thirty (30) days or the claim will be closed out, and NTG will no longer have any obligation to facilitate the Cargo Claim.

**(a)** Any oral notice of claim must be followed by written notice of claim and submission of all necessary claim documents.

**(b)** Where claims are not filed within thirty (30) days or suits are not instituted therein in accordance with the foregoing provisions, NTG shall not be liable, and such claims will not be paid or facilitated through NTG.

**(c)** After thirty (30) days from delivery, NTG will no longer be responsible for facilitating the claims process. At this time Customer must move forward and file direct with the Carrier and their insurance company should Customer intend to file a claim.

**(d)** Customer agrees that any suit brought against NTG must be commenced within one (1) year from the date after completion of the services performed. In the event of delay or non-delivery, the scheduled delivery date shall be deemed as the day on which services were completed for purposes of computing the one-year time limit.

**3)** A claim filed within the appropriate time limits must:

**(a)** Contain facts sufficient to identify the baggage or shipment(s) of property;

**(b)** Assert liability for alleged loss, damage, or delay;

**(c)** Make a claim for the payment of a specified or determinable amount of money;

**(d)** Complete NTG's standard Claims Presentation Form, and

**(e)** If applicable, inspection reports, photos, affidavits, etc.

**4)** All claims must specify an exact U.S. Dollar amount to be legally sufficient.

**(a)** Failure to include a claim amount invalidates the claim.

**(b)** Claims must reflect replacement cost of the specified merchandise damaged or at loss; not retail value.

**5)** Customer agrees to not withhold payment from NTG for transportation of freight based on any pending cargo claims or perceived deficiency in performance or service. Customer agrees that NTG has no obligation to consider claims or to assist Customer in the filing of such claims against carriers or warehousemen on behalf of Customer if Customer has not paid NTG's invoices in full for the shipments in which claim arose. When Customer is filing for partial shipment damage, loss, or rejection, freight charges for services rendered are still due to NTG within terms.

**(a)** All other loads NTG has arranged for Customer are considered unrelated and must be processed under regular pay terms.

**(b)** NTG reserves the right to bill any other party that has an invested interest in the freight if the bills are not paid.

**6)** Once payment for resolution is accepted, Customer agrees to release NTG from any further claim and will effectively foreclose any later attempts to recover additional damage or loss from NTG.

**C. Damage. 1)** Whenever damage is discovered, it is important to have an immediate inspection made at that point and the nature and extent of the damage thoroughly documented. All damage must be documented at the point of delivery and noted on the proof of delivery. 2) If a shipment or a portion thereof is discovered to be in damaged condition at the time of delivery, the consignee should always make a notation of the damage on the delivery receipt before accepting delivery. Failure to make such notation on the delivery receipt is prima facie evidence of the shipment's good condition at the time of delivery, which can only be overcome by clear and strong evidence to the contrary. 3) All claimed and damaged goods must be available for inspection for NTG to facilitate the claims process.

**1)** Consequential damages resulting from freight storage fees or delay such as interruption of an assembly line, cost of an extra unloading crew, air freight for a replacement shipment, loss of future sales or profits, per diem, demurrage, storage, etc. are usually considered "special damages" and are not recoverable unless NTG was given notice at the time of shipment that a failure to make timely delivery will result in specified damages.

**2)** Customer is obligated to mitigate its damages for loss or damage to Goods and is not entitled to abandon the Goods to NTG or the Carrier. If Customer does not elect to salvage the Goods, any Claim for Goods loss or damage will nevertheless be reduced by a reasonable salvage allowance and by reasonable storage or other costs incurred while waiting for disposition instructions.

**3)** If events or circumstances, including Customer's or its consignee's failure to take delivery, occur that affect performance, NTG will take reasonable steps to obtain Customer's further instructions. If, for whatever reason, NTG does not receive timely instructions, or NTG, in its sole discretion, determines that compliance with such instructions is impracticable, NTG may: a) arrange for storage of, or store, the Goods at the sole risk and expense of Customer, or; b) authorize any Carrier to abandon transportation and make the Goods or any part of them available to Customer at a place that is reasonable under the circumstances. In the event that any shipment is refused or remains unclaimed at destination or any transshipping point in the course of transit or is returned for any reason, Customer will nevertheless pay NTG for all charges and expenses in connection therewith.

**4)** NTG is not responsible to Customer or others for delay or deterioration of Goods from delay, whether with or without cause. NTG is also not responsible for deterioration of Goods arising from breakdown or malfunction of refrigerated equipment, or changes in temperature, even if the rates quoted are for temperature controlled equipment or for temperature sensitive Goods

**D. Concealed Damage or Loss. 1)** Customer must provide proof that shipment was in good order and condition at the time of delivery to the originating Carrier and it was in damaged condition at the time of tender by the delivering Carrier to the consignee. **2)** For shipment claims of loss or damage to contents of shipment that could not have been noted at the time of delivery, must be reported within forty-eight (48) hours of delivery. **3)** There will be a presumption that the goods were not damaged in transit whenever a consignee fails to report concealed damage within fifteen (15) days of delivery without exception.

**E. Miscellaneous.** Customer agrees that NTG shall have a lien in the amount of any unpaid invoices on any insurance proceeds issuing as a result of loss, damage, or delay to Customer's goods.

# VI. TRANSPORTATION STIPULATIONS

**A. Authority of Law. 1)** Broker will be excused in cases where there is an intervention of lawful authority on the shipment. **2)** Broker will not be held responsible in cases where the Department of Transportation has delayed shipment or broken seal for inspection.

**B. Force Majeure. 1)** NTG and its Carriers shall not be liable for delay or failure to perform any obligation resulting from circumstances beyond its control, including but not limited to any fire, explosion, act of God (including floods, hurricanes, tornadoes, earthquakes, severe weather conditions and natural disasters); strike, lockout or labor shortage or disturbance; war, terrorism, embargo, quarantine, riot, civil disobedience, hijacking or robbery; congestion, derailment or service issues affecting the Carriers; closing or disruptions affecting highways, rail networks, ports, air traffic or other transportation systems; the acts of any Government Authority or customs inspection requirements; acts or omissions of Customer; or any other cause outside of the reasonable control of NTG or the Carrier. **2)** In the event that a party intends to invoke this force majeure provision, that party shall provide prompt notice to the other party as soon as possible after the occurrence of the event giving rise to the claim of force majeure.

**C. Loading, Packing, and Securing.** It is the Customer's responsibility to block and brace their loads to prevent shifting while in transit unless otherwise notified in writing to NTG prior to shipment. Neither NTG nor the Carrier will be liable for the following: **1)** Damage to Goods or equipment to the extent due to packaging, loading, unloading, blocking, bracing or securing of the Goods. **2)** Customer will provide all tie-down devices, dunnage, and special tools required to secure the load, unless NTG has been notified prior to facilitating transportation of shipment. **3)** Customer certifies that the shipment is sufficiently packaged to withstand normal rigors of truck transportation. **4)** Any article susceptible to damage by ordinary handling must be adequately protected, packaged, and marked in such a way as to alert the Broker and Carrier of the possibility of damage from ordinary handling. **5)** Damage to Goods or equipment to the extent due to inherent vice or defect in the Goods transported, including rusting of metals, swelling of wood caused by humidity, moisture or condensation, deterioration of perishable products, or damages caused by heat or cold; **6)** Damage to Goods or equipment to the extent due to force majeure events as described in these Terms; **7)** damage to Goods or equipment to the extent due to an act, omission or default of Customer, including the consignor, the consignee, the beneficial owner of the Goods or other third party logistics provider; **8)** shipments stopped and held in transit at Customer's request; or **9)** loss or damage of Goods that violate any applicable law or regulation, have not been accurately described, or that have been loaded in a Trailer so that the combined weight exceeds applicable weight limits. Customer is solely responsible for properly identifying and credentialing the commercial vehicle and carrier upon its arrival to the loading site. Customer and or its shipper is responsible to ensure that all carrier information including, but not limited to commercial driver's license(s), VIN number(s), and license plate information will be thoroughly checked, documented, and verified as NTG's contracted carrier. Customer will indemnify and hold NTG harmless from any fine, claim or cause of action arising from breach of this warranty. Customer will defend, indemnify and hold NTG and the Carriers harmless from any Claim for loss, damage or delay to Goods in excess of the liabilities assumed under, or the limitations contained in, these terms and conditions or filed other than in accordance with these terms and conditions.

**D. Shipper Load and Count. 1)** Where shipments are sealed by the shipper before tendering to the Carrier, the Carrier has no obligation in regards to improper loading or shipper negligence. **2)** Customers will load, count and seal freight to ensure its integrity throughout the trip. Since the Carrier does not provide the labor, whether by the driver, or otherwise, and further is not liable for shortages or damage caused by the Customer's improper loading. **3)** Inadvertent omission of this notation shall not result in a presumption of Carrier liability for shortage or damage where the driver was either not present or not allowed to observe the loading or unloads. **4)** Where the Customer loads the cargo, NTG and its contracted Carrier are not responsible for damages caused by non-receipt by the Carrier of any part of the goods by the date shown on the bill of lading. Failure of the goods to correspond with the description contained in the bill of lading/Proof of Delivery, or for damages caused by improper loading provided that a "shipper load and count" notation is contained on the bill of lading, or an intact seal is notated on the bill of lading at the time of delivery. **5)** These conditions shall apply to, but not be limited to, all over the road, drayage, LTL, intermodal, airport/terminal pickups.

**E. Temperature Controlled Loads.** 1) Customer must properly precool (if required) and package the goods before the scheduled loading time to ensure loading can be accomplished without unnecessary delay and to have product at correct temperature for loading. 2) Unreasonable delays at shipping point may be chargeable as detention fees against the party that contracted for the carriage, and this party may, in turn, have a corresponding claim to recover detention fees and other losses against a shipper that causes an unreasonable delay. 3) Customer must notify NTG and Carrier of temperature for shipment within sufficient time in order to properly cool and regulate temperature prior to Carrier arrival at shipper. 4) It is Customer's responsibility to ensure truck is at proper temperature to load product. Customer may reject truck if the temperature differs than what was instructed. 5) If the consignee wants to reject part of a shipment that is "non-conforming" per its contract of sale with the vendor, it has an obligation to notify the seller-Customer and come to agreement as to what to do with the goods, where to send them, and who will pay for any freight charges. Then the consignee has to make a separate new contract of carriage with the Carrier for the return shipment, including where the goods are to be delivered and who should pay for the freight charges, and the Carrier should issue a new bill of lading for the return shipment. 6) If you reject a shipment because it is "non-conforming" (and not because if was damaged in transit) the Carrier will normally issue an "on-hand notice" and request instructions as to what should be done with the goods. If no instructions are received the Carrier may have the right to sell them and apply the proceeds to its freight and/or storage charges, with the balance of the proceeds (if any) for the account of the owner.

**F. Less-Than-Truckload (LTL).**

1) **LTL Quoted Rate**: All shipments are rated, quoted, and booked based on information provided by the Customer. Factors in this calculation include, but are not limited to:

   (a) The gross weight of the shipment including all packaging materials and pallets.

   (b) The commodity being shipped resulting in an NMFC code and freight class.

   (c) The dimensions per shipping unit and volume of space needed.

   (d) The number of shipping units.

   (e) Accessorial Services: accessorial services are services provided by the Carrier in addition to the basic transportation of the freight. Freight is quoted from dock to dock therefore any accessorial services are extra charges. This includes, but is not limited to: lift gates, commercial, residential, or inside deliveries, appointments, temperature control, location updates and other services outside of normal shipping of freight.

2) **LTL Billing:**

   (a) **Initial Billing**: The estimated/initial cost for each shipment is billed and charged to Customer's open account at the time of dispatch. Customer understands that this initial billing is based on the information provided by the Customer and that this billing is done in good faith by NTG with the assumption that the Customer provided true and accurate information reflecting the actual description of their shipment and services to be provided.

   (b) **Adjustments**: The Carrier reserves the right to verify a shipment's weight, dimensions, class and any accessorial services provided. When a Carrier discovers these items are incorrectly described on the BOL, a freight inspector will document the differences and a "Billing Adjustment" will be issued. Should this occur, Customer agrees to pay for all adjustments (if any) and adjustments will be automatically charged to Customer's open account with NTG. Billing adjustments will also incur a rebilling and reprocessing fee.

   (c) **Bill of Lading**: The Customer is required to use the Bill of Lading (BOL) supplied and issued by NTG. Failure to do so may result in delivery delays of freight and extra charges due to loss of discounts and reprocessing fees.

   (d) **Disputes**: If rates are adjusted by the Carrier, NTG has ten (10) business days to dispute and appeal the adjustments. NTG then has the opportunity to provide proof to reverse these adjustments.

   (e) **Cancellation of Services**: Customer may cancel a freight shipment at any time. Within twenty-four (24) hours a fee of up to 10% may be charged to compensate Carrier.

   (f) While truckload freight is covered up to $100,000.00 in liability insurance, LTL freight can range anywhere from ten ($0.10) cents to twenty ($20.00) dollars per pound depending on class of commodity. Additional cargo insurance can be arranged and purchased by written request of Customer and approval by NTG.

   (g) **Detention**: Only the first thirty (30) minutes at the shipper or receiver are free. Any additional hours will require a detention payment of $50.00/hour.

**G. Drayage.** 1) Quotations as to fees, rates of duty, freight charges, insurance premiums or other charges given by NTG to Customer are for informational purposes only and are subject to change without notice. 2) Customer will be renting space in container subject to charges for time period container is used. 3) All charges must be paid by Customer in advance unless NTG agrees in writing to extend credit to Customer.

1) **Per Diem, Detention, and/or Demurrage:**

   (a) NTG will invoice for Per Diem, Detention, and Demurrage charges upon receipt from steamship line, rail yard or airline.

**(b)** Per Diem, Detention, and/or Demurrage invoices may be submitted separately to Customer and are due upon receipt of invoice by Customer. Penalty charges may apply where invoices are not paid within seven (7) days of receipt. These charges shall be the sole responsibility of Customer.

**(c)** NTG reserves up to six (6) months after shipment is completed to invoice for per diem, detention, and/or demurrage. Processing fees from carriers may apply.

**(d)** Customer is responsible for payment on invoices for any additional charges incurred from Freight Forwarder, steamship, rail yard and/or airline.

**(e)** Detention: Only the first thirty (30) minutes at the shipper or receiver are free. Any additional hours will require a detention payment of $50.00/hour.

**2)** Customer is responsible for any and all additional service charges incurred during transit, unless otherwise agreed upon in writing by NTG. Charges will reflect NTG's market standard rates.

**H. Export/Import.** 1) For international shipments, Customer authorizes the use of a Freight Forwarder of NTG's choosing. 2) Customer agrees to sign a Power of Attorney required by Freight Forwarder, and by doing so, Customer also agrees to any terms and conditions held by Freight Forwarder. 3) NTG will be acting as an "agent" of the Customer for the purpose of performing duties in connection with the entry and release of goods, post entry services, the securing of export licenses, the filing of export and/or security documentation on behalf of the Customer and other dealings with Government Agencies, or for arranging transportation services or other logistics services in any capacity other than as a broker. 4) Upon written request, NTG will provide a copy of the chosen Freight Forwarder's terms and conditions to Customer prior to moving any shipments. 5) NTG does not assume responsibility or liability for any action(s) and/or inaction(s) of such third parties and/or its agents, and shall not be liable for any delay or loss of any kind, which occurs while a shipment is in the custody or control of Freight Forwarder. 6) Unless requested to do so in writing and confirmed by NTG in writing, NTG is under no obligation to procure insurance on Customer's behalf once in possession of Freight Forwarder. 7) Once Freight Forwarder is in possession of container, the liability will be passed onto the Freight Forwarder based on their terms, conditions, and coverage levels. 8) NTG will assist in facilitating any claim Customer provides through the Freight Forwarder directly, but NTG will not be held responsible for damage, loss, or delay while in possession of the Freight Forwarder. 9) Customer represents and warrants that it will comply with all laws and regulations applicable to the Customer and/or any shipment or transaction hereunder, including without limitation, Presidential Executive Order 13224, the USA Patriot Act, the Bank Secrecy Act and the Money Laundering Control Act. 10) Demurrage charges will be based on fees designated by the steamship or airline for the use of their shipping containers. All demurrage charges must be paid in full by Customer. 11) Detention and Per Diem charges will incur if container must be stored at the terminal or remains in possession of the steamship or airline beyond the set amount of free time. 12) Customer will be held responsible for any additional charges incurred from Freight Forwarder, steamship, and/or airline.

**I. Miscellaneous.** 1) For all shipments moving intermodally or over the road, insertion of NTG's name on the Bill of Lading as the "carrier" by any entity other than NTG will be for Customer's convenience only and will not imply that NTG is actually the Carrier of that shipment or otherwise change NTG's status in handling that shipment. 2) Customer warrants that it is either the owner or the authorized agent of the owner of the Goods tendered for Services and that it has the authority to, and does, accept these Terms for itself and where applicable, as agent for and on behalf of the owner and any other person involved in the transportation, including but not limited to any consignor or consignee, logistics providers, freight forwarders, or insurers, and these terms and conditions will be binding on such persons or entities. 3) Customer will obtain all necessary permits and authorizations necessary to ship the Goods, including but not necessarily limited to, export and import licenses and permits, and agrees to comply with all applicable laws, including, but not necessarily limited to, any prohibitions on selling to any person on a U.S. or Canadian export control list. 4) If rates are negotiated between the Parties and not otherwise confirmed in writing, such rates will be considered "written," and will be binding, upon NTG;s invoicing to Customer. 5) Customer will not request, and NTG will have no responsibility to arrange for the transport of any of the following: Goods the replacement value of which exceeds $100,000.00; luxury Goods (including, but not limited to, works of art, jewelry; currency, negotiable instruments or securities of any kind; precious metals or stones; antiques; human remains; livestock;) Customer will defend, indemnify and hold NTG harmless against any Claims as a consequence of NTG's failure to make arrangements noted herein. 6) IN THE EVENT YOU USE THIRD PARTY PAYMENT SERVICES, YOU ARE PLACING YOUR COMPANY'S CREDIT REPUTATION IN THE HANDS OF OTHER PARTIES AND ULTIMATELY REMAIN RESPONSIBLE FOR TIMELY PAYMENT OF INVOICES REGARDLESS OF ANY AGREEMENTS YOU MAKE WITH THE THIRD PARTY. PAYMENT MUST BE MADE IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF NTG. NON-PAYMENT OF INVOICES MAY BE CAUSE FOR SUSPENSION OF CREDIT AND OTHER PENALTIES.

**J.** NTG SHALL HAVE A LIEN ON ANY GOODS SHIPPED UNDER THIS AGREEMENT FOR FAILURE TO PAY FEES ON CURRENT AND PRIOR SHIPMENTS, REGARDLESS OF CREDIT ARRANGEMENTS, OWED BY THE CUSTOMER, CONSIGNEE, HOLDER, OR ASSIGNEE ON ANY BILL OF LADING. CUSTOMER AGREES THAT NTG'S LIEN CONTINUES IN EFFECT AFTER THE GOODS ARE DELIVERED AND UNTIL ALL CHARGES ARE PAID. Customer agrees to sign any notice of a security interest whether in the form of a UCC-1 or other form requested by NTG. Customer appoints NTG as its attorney-in-fact to sign any such notice on Customer's behalf in the event Customer fails to sign it immediately upon NTG's request.

## VII. INDEMNIFICATION

**A.** Except for Claims for loss or damage to Goods, which are governed by these terms and conditions, Customer will defend, indemnify and hold NTG, its employees, and agents harmless from and against any and all Claims arising out of Customer's acts or omissions where such Claim is caused by **(1)** the negligence or intentional misconduct of Customer; **(2)** Customer's or its employees' or agents' violation of applicable laws or regulations; **(3)** Customer's or its employees' or agents' failure to comply with these Conditions; **(4)** Customer's or its employees' or agents' failure to comply with obligations imposed by underlying Carriers; or **(5)** NTG's compliance with or reliance on Customer's instructions; except in each case to the extent such Claim represents consequential, punitive or special damages or is the result of the negligence or other wrongful conduct of NTG or a Carrier.

**B.** Customer shall hold NTG harmless from and shall defend and indemnify NTG against any loss, damage, claim, or suit arising from any breach of the Customer's warranties as set forth herein. If Customer or NTG receives a Claim for which the other party is responsible as an indemnifying party, the party receiving the Claim will promptly notify the other party and provide reasonable assistance and information requested in the defense against such Claim. Customer agrees and understands that NTG's liability will be limited as provided herein, and that NTG will not be liable for loss, damage, missed-delivery or delay of any shipment caused by or arising from the acts, omissions, negligence or willful misconduct of Carriers, customs brokers, forwarders and agents to whom the Goods may be entrusted.

## VIII. CONFIDENTIALITY

**A. Back Solicitation.** Customer acknowledges and agrees that the names, routes and pricing of the Carriers and other service providers utilized by Broker are confidential information and are in the nature of a trade secret. Customer shall not directly contact or solicit rates, bids or service from any underlying Carrier or service provider where **a)** the availability of Carrier or service provider to perform such services first became known to Customer as a result of Broker's efforts, or **b)** where Customer's traffic was first tendered to the underlying Carrier or service provider by Broker. If Customer breaches this provision and "back-solicits" Broker's underlying Carriers and/or service providers, and/or tenders traffic to such Carriers or service providers, Broker is then entitled, for a period of eighteen (18) months after the involved traffic first begins to move, to payment from Customer of 15% of the gross transportation charges for all such traffic, as liquidated damages. Termination of the relationship between Broker and Customer shall not affect the enforceability and applicability of the foregoing provisions of this clause for a period of two years after termination.

## IX. TERM OF AGREEMENT AND TERMINATION

**A.** This Agreement shall remain in effect until canceled by either party upon thirty (30) days' written notice to the other party. If Customer terminate this Agreement, Customer agrees to pay NTG's fees for all services and expenses incurred up to the point of termination forthwith upon issuance of NTG's invoice. NTG has the right to immediately terminate this Agreement upon breach of the agreement by Customer for failure to pay NTG's fees.

**B.** Customer understands that the terms and conditions under which NTG's services are provided are subject to change. Customer is advised to take note of the most current terms and conditions which are posted on NTG's website. Customer agrees that the posted terms and conditions on NTG's website on the date of a shipment will apply to that shipment and govern the parties' obligations.

**C.** These terms comprise the entire agreement between Customer and NTG. If the terms of this Agreement differ in any material way from the terms of Customer's order or other documents issued to NTG, the terms of this Agreement shall take precedence over the terms of any such order or documents.

## X. SEVERABILITY

**A.** If any term, provision, covenant or condition of these Terms, or any application thereof, should be held by a Court of competent jurisdiction to be invalid, void or unenforceable, the Parties agree that such portion or provision shall be deemed severable and all provisions, covenants, and conditions of these Terms, and all applications thereof not held invalid, void or unenforceable, shall continue in full force and effect and shall in no way be affected, impaired or invalidated thereby. The representations and obligations of the Parties will survive termination of these Terms for any reason.

## XI. LIMITATION OF ACTIONS

**A.** Other than Claims for loss, damage or delay to Goods or invoice disputes, any action against NTG, whether such Claim is founded in contract or tort, is waived unless commenced within two (2) years of the date the conduct giving rise to the Claim occurred.

**B.** IN NO EVENT WILL NTG BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, USE OR OPPORTUNITY, WHETHER OR NOT SUCH DAMAGES WERE FORESEEN OR UNFORESEEN, AND WHETHER OR NOT THE COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**C.** THE SERVICES ARE PROVIDED "AS IS", AND NTG DISCLAIMS ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS RELATING TO THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY EXPRESS OR IMPLIED REPRESENTATIONS, WARRANTIES OR CONDITIONS OF FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY OR CONDITION ARISING BY STATUTE, CUSTOM OR USAGE OF TRADE RELATED TO THE SERVICES PROVIDED HEREUNDER.

## XII. NON-WAIVER; REMEDIES

**A.** Delay or failure of either Party to insist upon performance of any of these Terms, or to exercise any right or privilege herein, or the waiver of any breach of any of the Terms, will not be construed as waiving any such terms, conditions, provisions, rights, or privileges, but the same will continue and remain in full force and effect as if no forbearance or waiver or delay had occurred. Consent or approval by a Party to any act requiring consent or approval will not be deemed to waive or render unnecessary consent or approval of any subsequent similar act. NTG and Customer hereby waive any and all rights and remedies provided for by Part B of Subtitle IV to Title 49 of the U.S. Code to the extent such rights and remedies conflict with the provisions of these Terms. NTG's rights and remedies under these Terms will be cumulative, and its pursuit of any such right or remedy will not preclude it from pursuing any other available right or remedy.

## XIII. GOVERNING LAW AND FORUM

**A.** These Terms will be deemed to have been drawn in accordance with the statutes and laws of the state of Georgia and in the event of any disagreement or dispute, the laws of Georgia will apply, without regard to its choice or conflict of law rules, and suit must be brought exclusively in Georgia as each Party specifically submits to the exclusive personal jurisdiction of such courts for disputes involving these Terms or the Services. By doing business with NTG, Customer hereby submits to the jurisdiction and venue of the state courts located in Fulton County, Georgia, or a venue to be decided at the sole discretion of Nolan Transportation Group, with respect to any and all matters arising from this agreement. Customer hereby waives all objections to venue and jurisdiction, including forum *non conveniens*. By doing business with NTG you are subject to NTG's continued terms and conditions contained herein.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date served the foregoing *Defendant Nolan Transportation Group, LLC's Answer and Defenses to Plaintiff's Complaint* upon all judges, clerks, and opposing counsel to the Clerk of Court electronically using Court's electronic e-filing system which will automatically send e-mail notification of such filing to counsel of record and others who are e-file participants. Counsel of record is as follows:

> Jeremy R. Handschuh, Esq.
> Mitchell-Handschuh Law Group
> 3390 Peachtree Rd, NE, Suite 520
> Atlanta, GA 30326
> Jeremy@m-hlawgroup.com

This 19th day of February, 2026.

> /s/ Aleksandra Mitchell
> Aleksandra Mitchell
> Georgia Bar No. 136019

STONE KALFUS LLP
One Midtown Plaza
1360 Peachtree Street NE
Suite 1250
Atlanta, GA 30309
(404) 736-2600 (telephone)
(877) 736-2601 (facsimile)